Daniel Sadeh, Esq.
**HALPER SADEH LLP**
667 Madison Avenue, 5th Floor
New York, NY 10065
Telephone: (212) 763-0060
Facsimile: (646) 776-2600
Email: sadeh@halpersadeh.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THOMAS BERAUD, <br><br> Plaintiff, <br><br> v. <br><br> DIAMOND S SHIPPING INC., ALEXANDRA KATE BLANKENSHIP, GERASIMOS G. KALOGIRATOS, HAROLD L. MALONE III, NADIM Z. QURESHI, CRAIG H. STEVENSON, JR., BART H. VELDHUIZEN, and GEORGE CAMBANIS, <br><br> Defendants. | Case No: <br><br><br> JURY TRIAL DEMANDED |

**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Plaintiff Thomas Beraud ("Plaintiff"), by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys.

**NATURE OF THE ACTION**

1. This is an action against Diamond S Shipping Inc. ("Diamond" or the "Company") and its Board of Directors (the "Board" or the "Individual Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C.

1

§§ 78n(a) and 78t(a), and Rule 14a-9 promulgated thereunder by the SEC, 17 C.F.R. § 240.14a-9, in connection with the proposed merger (the "Proposed Transaction") of Diamond, International Seaways, Inc. ("INSW"), and Dispatch Transaction Sub, Inc. ("Merger Sub"), a wholly owned subsidiary of INSW.

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to Sections 14(a) and 20(a) of the Exchange Act (15 U.S.C. §§ 78n(a) and 78t(a)) and Rule 14a-9 promulgated thereunder by the SEC (17 C.F.R. § 240.14a-9).

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

4. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as a substantial portion of the transactions and wrongs complained of herein had an effect in this District, the alleged misstatements entered and the subsequent damages occurred in this District, and INSW and Merger Sub are headquartered in New York City.

5. In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6. Plaintiff is, and has been at all relevant times hereto, an owner of Diamond common stock.

7. Defendant Diamond provides seaborne transportation of crude oil, refined petroleum, and other products in the international shipping markets. The Company is incorporated in the Republic of the Marshall Islands. The Company's common stock trades on the New York Stock Exchange under the ticker symbol, "DSSI."

8. Defendant Alexandra Kate Blankenship ("Blankenship") is a director of the Company.

9. Defendant Gerasimos G. Kalogiratos ("Kalogiratos") is a director of the Company.

10. Defendant Harold L. Malone III ("Malone") is a director of the Company.

11. Defendant Nadim Z. Qureshi ("Qureshi") is Chairman of the Board of the Company.

12. Defendant Craig H. Stevenson, Jr. ("Stevenson") is President, Chief Executive Officer, and a director of the Company.

13. Defendant Bart H. Veldhuizen ("Veldhuizen") is a director of the Company.

14. Defendant George Cambanis ("Cambanis") is a director of the Company.

15. Defendants Blankenship, Kalogiratos, Malone, Qureshi, Stevenson, Veldhuizen, and Cambanis are collectively referred to herein as the "Individual Defendants."

16. Defendants Diamond and the Individual Defendants are collectively referred to herein as the "Defendants."

**SUBSTANTIVE ALLEGATIONS**

A. **The Proposed Transaction**

17. On March 31, 2021, Diamond and INSW announced that they had entered into a definitive merger agreement pursuant to which INSW would merge with Diamond in a stock-for-stock transaction. Under the terms of the merger agreement, Diamond shareholders will receive

3

0.55375 shares of INSW common stock for each share of Diamond common stock held. Subsequent to the Proposed Transaction, INSW and Diamond shareholders will own approximately 55.75% and 44.25% of the combined company, respectively, using fully diluted share counts as of March 30, 2021.

18. The press release announcing the Proposed Transaction states, in pertinent part:

**International Seaways and Diamond S Shipping Announce Merger**

*Creates Second Largest US-Listed Tanker Company by Vessel Count and Third Largest by Dwt with an Enterprise Value of Approximately $2 Billion*

*Significant Synergies and Efficiencies to Drive Annual Cost Savings of over $23 Million and Revenue Synergies over $9 Million*

*Maintains Financial Strength and One of the Lowest Leverage Ratios in the Industry*

*Companies to Hold Investor Conference Call at 9:00 a.m. Eastern Time ("ET") on Wednesday, March 31, 2021*

March 31, 2021 06:00 AM Eastern Daylight Time

NEW YORK & GREENWICH, Conn.--(BUSINESS WIRE)--International Seaways, Inc. (NYSE: INSW) (the "Company" or "INSW") and Diamond S Shipping Inc. (NYSE: DSSI) ("Diamond S"), two of the leading tanker companies worldwide providing energy transportation services for crude oil and petroleum products in International Flag markets, announced today that their Boards of Directors have unanimously approved a definitive merger agreement pursuant to which INSW will merge with Diamond S in a stock-for-stock transaction. Subsequent to the merger, INSW and Diamond S shareholders will own approximately 55.75% and 44.25% of the combined company, respectively, using fully diluted share counts as of March 30, 2021.

\*    \*    \*

Key Terms of the Merger

- Diamond S shareholders will receive 0.55375 shares of INSW common stock for each share of Diamond S common stock held. Based on the closing prices of INSW's shares on March 30, 2021, the total stock consideration in the transaction has a value of approximately $416 million.

- Subsequent to the merger, INSW and Diamond S shareholders will own approximately 55.75% and 44.25% of the combined company, respectively, using fully diluted share counts as of March 30, 2021.

- INSW will assume Diamond S' net debt, which was $565^2$ million as of December 31, 2020.

- Immediately prior to the closing of the transaction, existing INSW shareholders will also receive a special dividend of $1.10 per share.

- Diamond S' affiliate management agreements with Capital Ship Management ("CSM") will be phased out over time, without interruption to the key customers being served by the vessels under CSM management.

- The merger, which is expected to close in the third quarter of 2021, is subject to the approval of the shareholders of INSW and Diamond S, regulatory approvals, and other customary closing conditions.

- The Board of Directors of INSW will comprise seven representatives of INSW and three representatives of Diamond S.

- A group of shareholders, representing approximately 14% and 29% of the issued and outstanding shares of INSW and Diamond S, respectively, has committed to vote in favor of the merger, subject to the terms and conditions contained in voting agreements reached with INSW and Diamond S.

- Following the merger, INSW will remain listed on the NYSE under the symbol "INSW".

- INSW and Diamond S received support for the transaction from the Diamond S bank group, led by Nordea Bank Abp, Crédit Agricole Corporate and Investment Bank and Skandinaviska Enskilda Banken AB (publ), who each also form key parts of INSW's lending group, and along with the remaining banks in the group have provided consents and agreed to amend their loan facilities.

For further information about the merger, please refer to the Registration Statement to be filed with the SEC by INSW.

**Advisors**

Jefferies LLC is serving as INSW's financial advisor for the transaction with Cleary Gottlieb Steen & Hamilton LLP and Holland & Knight LLP acting as its legal advisors.

Moelis & Company LLC is serving as Diamond S' financial advisor for the transaction, with White & Case LLP and Seward & Kissel LLP acting as its legal advisors.

*   *   *

**About International Seaways, Inc.**

International Seaways, Inc. (NYSE: INSW) is one of the largest tanker companies worldwide providing energy transportation services for crude oil and petroleum products in International Flag markets. INSW owns and operates a fleet of 36 vessels, including 11 VLCCs, 2 Suezmaxes, 4 Aframaxes/LR2s, 13 Panamaxes/LR1s and 4 MR tankers. Through joint ventures, it has ownership interests in two floating storage and offloading service vessels. INSW has an experienced team committed to the very best operating practices and the highest levels of customer service and operational efficiency. INSW is headquartered in New York City, NY. Additional information is available at www.intlseas.com.

**About Diamond S Shipping Inc.**

Diamond S Shipping Inc. (NYSE: DSSI) owns and operates 64 vessels on the water, including 13 Suezmaxes, 1 Aframax and 50 MR tankers. DSSI is one of the largest energy shipping companies providing seaborne transportation of crude oil, refined petroleum and other petroleum products. The Company is headquartered in Greenwich, CT. More information about DSSI can be found at www.diamondsshipping.com.

19. On June 11, 2021, the Company filed a Schedule 14A Definitive Proxy Statement under Section 14(a) of the Exchange Act (the "Proxy Statement") with the SEC in connection with the Proposed Transaction.

**B. The Proxy Statement Contains Materially False and Misleading Statements and Omissions**

20. The Proxy Statement, which recommends that Diamond shareholders vote in favor of the Proposed Transaction, omits and/or misrepresents material information concerning: (i) Diamond's and INSW's financial projections; (ii) the financial analyses performed by Diamond's financial advisor, Moelis & Company LLC ("Moelis"), in connection with its fairness opinion; (iii) the sales process leading up to the Proposed Transaction; and (iv) potential conflicts of interest involving Moelis.

6

21. The omission of the material information (referenced below) renders the following sections of the Proxy Statement false and misleading, among others: (i) Background of the Merger; (ii) Recommendation of the Diamond S Board and its Reasons for the Transaction; (iii) Opinion of Diamond S' Financial Advisor; (iv) Certain Unaudited Forecasted Financial Information of INSW; and (v) Certain Unaudited Forecasted Financial Information of Diamond S.

22. Unless and until the material misstatements and omissions (referenced below) are remedied before the July 13, 2021 shareholder vote on the Proposed Transaction, Diamond shareholders will be forced to make a voting decision on the Proposed Transaction without full disclosure of all material information. In the event the Proposed Transaction is consummated, Plaintiff may seek to recover damages resulting from Defendants' misconduct.

   1. **Material Omissions Concerning Diamond's and INSW's Financial Projections**

23. The Proxy Statement omits material information concerning Diamond's and INSW's financial projections.

24. With respect to the prospective financial information regarding Diamond for the years 2021 through 2025, the Proxy Statement fails to disclose: (1) all line items underlying (i) Net Revenue, (ii) Adjusted EBITDA, and (iii) Unlevered Free Cash Flow; (2) the Company's net income projections; and (3) a reconciliation of all non-GAAP to GAAP metrics.

25. With respect to the INSW forecasts used by Diamond and its financial advisor, the Proxy Statement fails to disclose: (1) all line items underlying (i) Adjusted EBITDA, and (ii) Unlevered Free Cash Flow; (2) INSW's net income projections; and (3) a reconciliation of all non-GAAP to GAAP metrics.

26. With respect to "INSW's Adjustments to the Diamond S Projections," the Proxy Statement fails to disclose: (1) all line items underlying (i) Net Revenue, (ii) Adjusted EBITDA,

7

and (iii) Unlevered Free Cash Flow; (2) the Company's net income projections; and (3) a reconciliation of all non-GAAP to GAAP metrics.

27. With respect to "INSW forecasts," the Proxy Statement fails to disclose: (1) all line items underlying (i) Net Revenue, (ii) Adjusted EBITDA, and (iii) Unlevered Free Cash Flow; (2) INSW's net income projections; and (3) a reconciliation of all non-GAAP to GAAP metrics.

28. The Proxy Statement provides that, in arriving at its fairness opinion, Moelis "reviewed certain third-party vessel appraisals of Diamond S and INSW provided to Moelis by the management of Diamond S and certain adjustments to be made to such appraisals as agreed by Diamond S and INSW in connection with a net asset value analysis[.]"

29. The Proxy Statement, however, fails to disclose the third-party vessel appraisals of Diamond and INSW and the adjustments made to such appraisals by Diamond and INSW.

30. The Proxy Statement provides that, in arriving at its fairness opinion, Moelis "reviewed estimates of management of INSW, as adjusted by the management of Diamond S, regarding cost savings and other synergies anticipated to result from the merger, including the amount and timing thereof (referred to in this section as the "Synergy Estimates")[.]"

31. The Proxy Statement, however, fails to disclose the Synergy Estimates and the adjustments made to INSW's synergy estimates by Diamond management.

32. The disclosure of this information is material because it would provide the Company's shareholders with a basis to project the future financial performance of the Company and combined company and would allow shareholders to better understand the financial analyses performed by the Company's financial advisor in support of its fairness opinion. Shareholders cannot hope to replicate management's inside view of the future prospects of the Company. Without such information, which is uniquely possessed by Defendant(s) and the Company's

financial advisor, the Company's shareholders are unable to determine how much weight, if any, to place on the Company's financial advisor's fairness opinion in determining whether to vote for or against the Proposed Transaction.

33. When a company discloses non-GAAP financial metrics in a Proxy Statement that were relied upon by its board of directors in recommending that shareholders exercise their corporate suffrage rights in a particular manner, the company must also disclose, pursuant to SEC Regulation G, all projections and information necessary to make the non-GAAP metrics not misleading, and must provide a reconciliation (by schedule or other clearly understandable method) of the differences between the non-GAAP financial metrics disclosed or released with the most comparable financial metrics calculated and presented in accordance with GAAP. 17 C.F.R. § 244.100.[1]

34. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

**2. Material Omissions Concerning Moelis' Analyses**

35. In connection with the Proposed Transaction, the Proxy Statement omits material information concerning analyses performed by Moelis.

36. With respect to Moelis' "*Net Asset Value Analysis*," the Proxy Statement fails to disclose the individual inputs and assumptions underlying the (i) discount rates ranging from

---

[1] Mary Jo White, *Keynote Address, International Corporate Governance Network Annual Conference: Focusing the Lens of Disclosure to Set the Path Forward on Board Diversity, Non-GAAP, and Sustainability* (June 27, 2016), https://www.sec.gov/news/speech/chair-white-icgn-speech.html (footnotes omitted) (last visited July 5, 2021) ("And last month, the staff issued guidance addressing a number of troublesome practices which can make non-GAAP disclosures misleading: the lack of equal or greater prominence for GAAP measures; exclusion of normal, recurring cash operating expenses; individually tailored non-GAAP revenues; lack of consistency; cherry-picking; and the use of cash per share data. I strongly urge companies to carefully consider this guidance and revisit their approach to non-GAAP disclosures.").

7.50% to 11.00%, and (ii) multiple range of 6.8x to 8.8x.

37. The Proxy Statement fails to disclose the following concerning Moelis' "*Discounted Cash Flow Analysis*": (1) all line items underlying the estimated future unlevered free cash flows projected by Diamond's and INSW's respective managements to be generated by Diamond and INSW, respectively; (2) the terminal values for Diamond and INSW; and (3) the individual inputs and assumptions underlying the (i) range of discount rates of 7.00% to 11.00%, and of 6.50% to 10.75%, and (ii) range of multiples of 4.00x to 5.00x, and of 4.75x to 5.75x.

38. The valuation methods, underlying assumptions, and key inputs used by Moelis in rendering its purported fairness opinion must be fairly disclosed to Diamond shareholders. The description of Moelis' fairness opinion and analyses, however, fails to include key inputs and assumptions underlying those analyses. Without the information described above, Diamond shareholders are unable to fully understand Moelis' fairness opinion and analyses, and are thus unable to determine how much weight, if any, to place on them in determining whether to vote for or against the Proposed Transaction. This omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

**3. Material Omissions Concerning the Sales Process Leading up to the Proposed Transaction**

39. The Proxy Statement omits material information concerning the sales process leading up to the Proposed Transaction.

40. The Proxy Statement provides that, "[o]n August 17, 2020, Diamond S, CSMC and CMTC executed a mutual confidentiality and standstill agreement."

41. The Proxy Statement, however, fails to disclose the terms of Diamond's confidentiality and standstill agreement with CSMC and CMTC, including whether such agreement contained a standstill provision with a "don't ask, don't waive" (DADW) provision

10

(including its time of enforcement) that would preclude potentially interested parties from making a superior offer for the Company.

42. Without this information, Diamond shareholders may have the mistaken belief that potential suitors are or were permitted to submit superior proposals for the Company, when in fact they are or were contractually prohibited from doing so. This information is material because a reasonable Diamond shareholder would want to know, prior to voting for or against the Proposed Transaction, whether other potential buyers are or were foreclosed from submitting a superior proposal.

43. The above-referenced omitted information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

**4. Material Omissions Concerning Potential Conflicts of Interest Involving Moelis**

44. The Proxy Statement omits material information concerning potential conflicts of interest involving Moelis.

45. The Proxy Statement provides that, "[i]n the past two years prior to the date of its opinion, Moelis also provided investment banking and other services to certain of Diamond S' significant shareholders, companies in which such shareholders had an interest and committees on which such shareholders participated, including acting as a financial advisor to WL Ross & Co in connection with a sale of an interest in a portfolio company that closed in December 2020, financial advisor to an ad hoc committee of senior secured creditors on which Invesco Ltd. or an affiliate thereof was a member in connection with a restructuring transaction that closed in October 2020, and financial advisor to a company in which Invesco Ltd. was a significant shareholder."

46. The Proxy Statement, however, fails to disclose the amount of compensation that

11

Moelis received or expects to receive for the aforementioned services it provided to certain of Diamond S' significant shareholders, including WL Ross & Co, Invesco Ltd., and/or their affiliates.

47. Disclosure of a financial advisor's compensation and potential conflicts of interest to shareholders is required due to their central role in the evaluation, exploration, selection, and implementation of strategic alternatives and the rendering of any fairness opinions. Disclosure of a financial advisor's potential conflicts of interest may inform shareholders on how much weight to place on that analysis.

48. The omission of the above-referenced information renders the Proxy Statement materially incomplete and misleading. This information, if disclosed, would significantly alter the total mix of information available to the Company's shareholders.

## COUNT I
### For Violations of Section 14(a) and Rule 14a-9 Promulgated Thereunder
### Against All Defendants

49. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

50. During the relevant period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false and misleading Proxy Statement specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder by the SEC.

51. Each of the Individual Defendants, by virtue of his/her positions within the Company as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a) of the Exchange Act. Defendants, by use of the mails and means and instrumentalities of interstate commerce, solicited and/or permitted the use

of their names to file and disseminate the Proxy Statement with respect to the Proposed Transaction. The Defendants were, at minimum, negligent in filing the materially false and misleading Proxy Statement.

52. The false and misleading statements and omissions in the Proxy Statement are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Transaction.

53. By reason of the foregoing, Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

54. Because of the false and misleading statements and omissions in the Proxy Statement, Plaintiff is threatened with irreparable harm.

## COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

55. Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

56. The Individual Defendants acted as control persons of the Company within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their senior positions as officers and/or directors of the Company and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy Statement filed with the SEC, they had the power to and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the false and misleading Proxy Statement.

57. Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to

and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Proxy Statement, and to correct promptly any public statements issued by the Company which were or had become materially false or misleading.

58. In particular, each of the Individual Defendants had direct and supervisory involvement in the operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. The Individual Defendants were provided with or had unlimited access to copies of the Proxy Statement and had the ability to prevent the issuance of the statements or to cause the statements to be corrected. The Proxy Statement at issue contains the recommendation of the Individual Defendants to approve the Proposed Transaction. Thus, the Individual Defendants were directly involved in the making of the Proxy Statement.

59. In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy Statement purports to describe the various issues and information that they reviewed and considered—descriptions which had input from the Individual Defendants.

60. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

61. As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 promulgated thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the

Exchange Act. As a direct and proximate result of Defendants' conduct, the Company's shareholders will be irreparably harmed.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction and any vote on the Proposed Transaction, unless and until Defendants disclose and disseminate the material information identified above to Company shareholders;

B. In the event Defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages;

C. Declaring that Defendants violated Sections 14(a) and 20(a) of the Exchange Act, and Rule 14a-9 promulgated thereunder;

D. Awarding Plaintiff reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E. Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: July 5, 2021                                  Respectfully submitted,

**HALPER SADEH LLP**

By: /s/ Daniel Sadeh
Daniel Sadeh, Esq.
Zachary Halper, Esq. (to be admitted *pro hac vice*)
667 Madison Avenue, 5th Floor
New York, NY 10065
Telephone: (212) 763-0060
Facsimile: (646) 776-2600

Email: sadeh@halpersadeh.com
zhalper@halpersadeh.com

*Counsel for Plaintiff*